In the Interest of S.J.H. and C.A.H., Plaintiff;

MISSOURI DIVISION OF FAMILY SERVICES, Respondent,

v.

A.R.H. (R), Appellant,

W.R.H., JR., Defendant.

No. WD 62904.

Missouri Court of Appeals, Western District.

Jan. 20, 2004.

Laura E. O'Sullivan, Kansas City, MO, for appellant, A.R.H.

Catherine A. Dempsey, St. Joseph, MO, for respondent Missouri Division of Family Services.

Michael B. Watkins, Chillicothe, MO, for S.J.H. and C.A.H.

Before SMITH, P.J., HOLLIGER and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

A.R.H. (Mother) appeals a judgment terminating parental rights to her daughters, S.J.H. and C.A.H., pursuant to Section 211.447.4(3), R.S.Mo.2000. We reverse the judgment because it is unsupported by clear, cogent, and convincing evidence that conditions of a potentially harmful nature continue to exist with little likelihood of being remedied in the near future.

### FACTUAL AND PROCEDURAL HISTORY

Mother and W.R.H. (Father) were married in 1993. S.J.H. was born of the marriage on December 17, 1995. During an argument between Mother and Father in July 1996, Mother threatened to kill herself and S.J.H. The threat resulted in the juvenile court taking jurisdiction over S.L.H. and placing her in foster care.

S.L.H. was returned to her parents' home five months later under supervision of the Division of Family Services (DFS), with Father designated as sole custodian. A second daughter, C.A.H., was born to Mother and Father on October 27, 1997.

Mother moved away from the family home in early 1999, taking both daughters with her. In April 1999, Mother was jailed after her probation for passing a bad check was revoked when she pled guilty to theft of a cell phone. Mother returned the children to Father's custody.

Two months later, Father was charged with child endangerment for burning S.L.H. with a cigarette. Both children were placed in foster care, where they have remained since June 1999.

Upon her release from jail in August 1999, Mother initiated contact with DFS and executed written service agreements in an effort to reunite with her children. Mother ultimately failed to comply with the agreements because she pled guilty to misuse of an ATM card and was re-incarcerated from August 2000 until February 2001.

Mother again contacted DFS upon her release from jail in February 2001 and entered into written service agreements in an effort to regain custody of her daughters. Mother's compliance was inconsistent with regard to provisions of the agreement requiring her to attend counseling services, pay child support, and report changes in her employment and residence to DFS. However, Mother did comply with provisions requiring her to regularly visit the children, maintain a stable residence, secure employment, attend parenting skills programs, and submit to mental evaluations.

In April 2001, Mother began living with her boyfriend, W.D., and his eleven-year old daughter. W.D. owned a three-bedroom home and was employed with a steady income. The couple became engaged in December 2001 and planned to marry in September 2003.[1] S.L.H. and C.A.H. visited Mother in the home with W.D. and his daughter. Mother told DFS she hoped to permanently reunite with the children in that environment.

DFS filed for termination of Mother and Father's parental rights on October 11, 2002. Father consented to the termination. The petition alleged Mother's parental rights should be terminated, pursuant to Section 211.447.4(3), because the children had been under the jurisdiction of the court for over a year, conditions existed which were potentially harmful to the children, those conditions were unlikely to soon change so the children could be returned to Mother, and the continuation of the relationship with Mother would diminish the prospects of a permanent home for the children.

Following trial on the petition, the court entered a judgment terminating Mother's parental rights on April 29, 2003. The court found the children faced a risk of potential harm due to Mother's "ongoing pattern of putting her own needs above those of her children" and Mother's inability to financially support the children. As examples of her misplaced priorities, the court found Mother did not comply with the DFS service agreements, in that she "failed to refrain from criminal activity while her children were in foster care, failed to successfully complete counseling (once due to her becoming incarcerated and once due to her simply stopping her attendance), failed to obtain psychiatric evaluation in a reasonably timely manner, and she failed to timely notify the Division of Family Services as to changes in her

1. Mother's divorce from Father was finalized in April 2002.

work or living circumstances." The court found a pattern of behavior "in such simple examples as [Mother's] failure to go to the Valentine's party at the girl's school, although she promised to do so." The court concluded Mother's testimony was "inconsistent" and "not credible" regarding her efforts to care for and reunite with the children. Based on these factual findings, the court terminated Mother's parental rights pursuant to Section 211.447.4(3). The court also made findings that the termination was in the best interests of the children.

Mother appeals, contending there was insufficient evidence to terminate her parental rights under Section 211.447.4(3), and that the trial court's best interest findings were against the weight of the evidence.

### STANDARD OF REVIEW

■ The trial court must follow a two-step analysis in deciding whether to terminate parental rights. In the first step, the court must consider whether the statutory termination grounds have been proven by clear, cogent, and convincing evidence. *In the Interest of D.C.S.*, 99 S.W.3d 534, 538 (Mo.App. W.D.2003). Evidence is clear, cogent, and convincing if it instantly tilts the balance in favor of termination when weighed against the evidence presented by the parent whose rights are at issue. *Id.*

We review the trial court's findings under this first step to determine whether clear, cogent, and convincing evidence supports the grounds for termination under the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) standard of review. *In re D.C.S.*, 99 S.W.3d at 538. We will reverse the judgment only if we conclude that it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law.

*Id.* The facts and reasonable inferences are viewed in a light most favorable to the judgment, with due regard given to the trial court's determination of witness credibility. *In the Interest of B.S.B. and B.A.B.*, 76 S.W.3d 318, 324 (Mo.App. W.D. 2002).

■ If a termination ground has been proven by clear, cogent, and convincing evidence, the trial court progresses to the second step and determines whether the termination of parental rights is in the child's best interest. *In re D.C.S.*, 99 S.W.3d at 538. Our review of the court's best interest finding is under an abuse of discretion standard. *Id.*

■ The termination of parental rights is "an exercise of awesome power and should not be done lightly." *In the Interest of C.N.G.*, 109 S.W.3d 702, 705 (Mo. App. W.D.2003). We review these decisions closely because the termination of parental rights interferes with a basic liberty: freedom from governmental interference with family and child rearing. *Id.*

### Sufficiency of the Evidence

■ The trial court relied on Section 211.447.4(3) as the sole ground for terminating Mother's parental rights. This provision allows such termination when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at any early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In

determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or another agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental health condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

Section 211.447.4(3). The trial court did not find that conditions which led to the assumption of jurisdiction over S.J.H. and C.A.H. still existed. Rather, the court found the children had been under the court's jurisdiction for more than one year and conditions of a potentially harmful nature exist "in that the children would face an ongoing risk of abuse and neglect in their biological mother's home due to her consistent pattern of putting her own wants and needs above those of the children ..., as well as her inability to support the children financially."

■ Mother contends the trial court erred in terminating her parental rights

pursuant to Section 211.447.4(3) because the juvenile officer failed to present clear, cogent, and convincing evidence that conditions of a potentially harmful nature continue to exist that would prevent Mother's reunification with the children in the near future. The ultimate issue when applying this subsection of the statute for continuation of conditions of neglect "is the continued existence of an unremedied, neglectful situation." *In re B.S.B.*, 76 S.W.3d at 333.

The primary basis for the trial court's finding of potentially harmful conditions was Mother's failure to comply with provisions of the seven service agreements she entered into with DFS between November 1999 and August 2002. The court concluded that Mother's non-compliance established an "on-going pattern of putting her own needs above those of her children." Provisions of the seven service agreements were similar and generally required Mother to: (1) attend counseling with various providers on a regular basis; (2) participate in the Parent Aid Program and other parenting skill programs; (3) visit the children on a regular basis and plan structured activities; (4) submit to a psychiatric evaluation and follow recommendations; (5) maintain the same residence for at least six months; (6) maintain steady employment; (7) abstain from criminal activity; (8) inform DFS of any changes in her employment, financial status, living arrangements, and health status; and (9) contribute to the children's needs by providing child support or clothing, toys, books, snacks, etc.

■ Our court has recognized that a parent's failure to comply with a written service agreement does not, in itself, constitute a ground for terminating parental rights. *In re C.N.G.*, 109 S.W.3d at 707. Non-compliance is merely a factor to consider in deciding whether the grounds set out in § 211.447.4(3) exist. *Id.* The statute

requires the trial court to consider "the extent to which the parties have made progress in complying with [the service agreement's] terms." Section 211.447.4(3)(a). The issue is whether progress has been made towards compliance with the service agreements not whether the compliance was full or substantial. *In re C.N.G.*, 109 S.W.3d at 707.

Viewed in a light most favorable to the judgment, the evidence at trial regarding Mother's compliance with the provisions of the service agreements was as follows:

1) *Counseling:* Mother attended individual counseling sessions from approximately October 1999 until her incarceration from August 2000 through February 2001. She resumed counseling in December 2001 but stopped attending in February 2002 due to conflicts with a provider. In early 2002, one of Mother's counselors (Melanie Meijering of the Children's Advocacy Center) noted that Mother was making great strides to improve her life.

2) *Parenting Skills Programs:* Mother regularly participated in the Parent Aid Program, attended seven of the eight Family Support Team meetings available to her, and took advantage of Family Assistance Services at the Lamoni Shelter from February 2001 through May 2001.

3) *Visitation:* Mother maintained regular visits with her children. Upon Mother's request, the visits were extended from one to three hours, including two hours without DFS supervision. Mother's DFS caseworker, Lucinda Dolan, reported that Mother failed to nurture, display affection, or express interest in the children's daily activities during her visits. However, Dolan's testimony contrasted with that of Patti Quilty, whom DFS contracted to supervise and observe Mother's weekly visits with the children from May 2001 through September 2002. Quilty testified to frequent occasions when Mother would hug, kiss, and tell the children she loved them. Mother also routinely played indoor and outdoor games with the children and engaged in seasonally appropriate activities such as swimming, hosting birthday parties, and preparing Easter eggs and Christmas decorations. When the children visited Mother at her home, she gave them computer games, watched movies with them, and taught them to bake treats in a child-size oven. Mother designated separate bedrooms for the girls and allowed them to help paint, decorate, and select furnishings. Mother's fiancé, W.D., actively participated during the children's visits to the home, as well as in the Family Support Team meetings. Quilty's supervision of Mother's visits ended in September 2002, due to funding cuts in the DFS budget.

4) *Evaluations:* Mother submitted to all psychiatric and psychological evaluations and bonding assessments requested of her, although her compliance was not always timely. Mother was prescribed anti-psychotic medications but eventually stopped taking the medication, without seeking follow-up treatment, due to side-effects.

5) *Residence:* The record does not indicate whether Mother maintained a consistent residence from November 1999 until she was incarcerated in August 2000. Mother was released from jail in February 2001 and began sharing a home with her fiancé, W.D., in April 2001. She continued to reside in that home for two years, up until the time of trial in March 2003.

6) *Employment:* Mother was employed at Hick's Drive–In during periods of time that she was not incarcerated between November 1999 and October 2002. She left Hick's, where she earned $4.50 hourly working 30–36 hours a week, to earn more money babysitting for friends and relatives. For the first few months, Mother

earned approximately $1,000 a month as a babysitter, but the income later decreased to $300–400 monthly. She applied for other jobs but had not been hired at the time of trial.

7) *Criminal Activity:* Mother pled guilty to fraudulent use of a relative's ATM card in August 2000. Since her release from jail in February 2001, Mother has not engaged in criminal activity.

8) *Reporting to DFS:* Mother frequently failed to report to DFS regarding changes in her employment, financial status, and living arrangements.

9) *Contributions:* Mother provided the children with birthday and Christmas gifts, Halloween costumes, games, and snacks during the course of their visits. In January 2002, Mother was ordered to begin paying monthly child support of $126.50. She paid sporadically and ceased all payments after the petition for termination of parental rights was filed in October 2002. Mother owed no child support at the time of trial because her wages had been garnished and her income tax refund intercepted to cover the arrearage.

In totality, the record indicates Mother was making progress in at least six of the nine areas covered by the service agreements. She actively participated in parenting skills programs, regularly visited with her children, had completed all evaluations, was consistently employed, had maintained a stable residence, and had not been involved in criminal activity for more than two years at the time her parental rights were terminated. The trial court's finding that Mother had made "little progress" in complying with the service agreements was against the weight of the evidence. The court's findings referenced only four provisions of the service agreements (criminal activity, counseling, psychiatric evaluation, and reporting to DFS) and failed to make any findings regarding

Mother's substantial progress in complying with the requirements for visitation, employment, residence, and parenting skill programs.

Although the trial court found Mother's testimony was not credible, our review indicates that much of the evidence regarding Mother's progress in complying with the service agreements was either uncontroverted or supported by the testimony of DFS officials. For example, there was no dispute that Mother regularly visited her children, maintained a stable residence, was routinely employed, attended the parenting skills programs, and had no criminal involvement, all in the two years prior to the termination of her parental rights. The court concluded Mother was not credible in explaining why she failed to follow the psychiatrist's recommendations for medication, why she pled guilty to misuse of the credit card, and whether she had been physically abused by her husband. Notably, the court did not find that Mother lacked credibility in testifying about those specific areas in which she had complied with the service agreements.

The trial court also concluded the children faced a risk of potential harm because Mother was unable to support them financially. While Mother admitted her current income was insufficient to support the children, there was evidence she had left a low-paying job to earn a greater income as a babysitter. That self-employment initially proved fruitful, but the income later decreased and Mother was seeking additional work at the time of trial. W.D. also testified he is assisting Mother in efforts to obtain her General Equivalency Diploma (GED), a further indication of her desire and preparation for better employment opportunities. The sole evidence of Mother's current inability to support the children was insufficient to prove that Mother's financial condition was

unlikely to change such that the children could be returned to her in the near future.

In summary, all of the potential harms cited by the trial court involved Mother's limited progress on select provisions of the service agreements, as well as Mother's present inability to financially support the children. There was substantial additional evidence in the record to establish that Mother was making steady progress on a majority of the service agreement provisions and in pursuing options to increase her income. The evidence cited by the trial court, when weighed against the opposing evidence, does not instantly tilt the scales in favor of terminating Mother's parental rights. The judgment is not supported by clear, cogent, and convincing evidence that conditions of a potentially harmful nature exist and that there is little likelihood those conditions could be remedied in the near future to allow S.J.H. and C.A.H. to be reunited with Mother. Accordingly, we reverse the judgment terminating Mother's parental rights.

The termination of parental rights requires strict and literal compliance with the statutes. *In re B.S.B.*, 76 S.W.3d at 335. Such rights should be terminated only when grave and compelling circumstances exist. *Id.* The primary concern is the best interests of the children, not whether the children would be better off in a foster home. *Id.* However, before the court can reach the issue of the children's best interests, there must be sufficient proof of acts authorizing termination under the statutes. *Id.* at 335–36.

Given our reversal on the termination grounds, we need not address Mother's point challenging the trial court's best interest analysis. We further note that our reversal of the judgment has no bearing on the issue of custody. *Id.* at 336. S.J.H. and C.A.H. shall remain in the custody of DFS, subject to Mother's reasonable visitation, as determined by the trial court, which retains jurisdiction over the children.

The judgment of the trial court is reversed.

All concur.