

# Missouri Court of Appeals

## Southern District

### Division Two

| | |
|---|---|
| In the Interest of:<br>D.J.G, Minor,<br><br>MISSOURI DEPARTMENT OF<br>SOCIAL SERVICES,<br>CHILDREN'S DIVISION, and,<br>HOWELL COUNTY JUVENILE<br>OFFICE,<br><br>     Petitioners-Respondents,<br><br>vs.<br><br>A.B., Natural Father,<br><br>     Respondent-Appellant. | No. SD32887<br><br>**Filed: March 31, 2014** |

APPEAL FROM THE CIRCUIT COURT OF HOWELL COUNTY

Honorable David P. Evans, Circuit Judge

**<u>AFFIRMED</u>**

A.B. ("Father") appeals the July 2013 judgment that terminated his parental rights in, to, and over his child, D.J.G., who was born in 2008 ("Child"). *See* section 211.447.[1] Father contends the trial court erred in terminating his parental rights because: 1) "[t]here was no clear, cogent and convincing evidence that [Father] failed to rectify the situation" as he "substantially complied with the terms of [the] service agreement, there was . . . not a mental condition that prevented [Father] from being a parent[,]" and he was not offered

---

[1] All statutory references are to RSMo Cum. Supp. 2011.

appropriate services; 2) "the preponderance of [the] evidence did not support a finding that it was in the best interest of [C]hild" to terminate Father's parental rights; and 3) "under [section] 211.447.5 . . . there was not substantial evidence to support the judgment."

Finding no merit in Father's claims, we affirm.

## Facts and Procedural Background

We view "evidence and permissible inferences drawn from the evidence in the light most favorable to the judgment." *In re the Adoption of C.M.B.R.*, 332 S.W.3d 793, 801 (Mo. banc 2011). Our summary of the relevant evidence adduced at trial is in accordance with that standard.

An investigator for the Department of Social Services ("DSS"), Henry Younger, testified that in December 2008, he was assigned to investigate a "hotline [report] regarding physical abuse" of Child. Mr. Younger began his investigation by visiting Child and Child's family at the hospital. Child was about nine months old at the time, and Mr. Younger's understanding was that Child had been taken to the hospital because he was "limp" and "lethargic" after being given "adult cough medicine[.]" Mr. Younger observed that "[C]hild had bruises on his back, had a bruise on his ear, [and had] one on [his] leg and cheek." The bruise on Child's back "covered a big portion of his back[.]" When Mr. Younger "tried to talk to [Child's parents] about it, they both just sat there. There was hardly no [sic] emotion." "Neither parent knew how . . . [C]hild received the bruises."

In addition to his parents, two other adults and a child resided in the same home as Child, and Child also had a babysitter. Because so many people had access to Child,

2

and no one admitted responsibility, Mr. Younger could not determine who had given Child the bruises. Child was not removed from his parents' custody, but Mr. Younger opened a "family-centered" case, believing that Child's family was in need of services based on their failure to notice Child's injuries. And because the identity of the person(s) who had abused Child was still unknown, Child was placed in a "kinship diversion" that resulted in his living with a relative after his release from the hospital.

Child's pediatrician, Dr. Carolyn Ellsworth, testified that Child "has had difficulty with allergies and has always been on medication since [she had] been treating him[.]" Child also had "mild asthma[,]" and he was being seen and treated by a pulmonary and allergy specialist in St. Louis at the time of trial. Dr. Ellsworth testified that Child's condition would be exacerbated by exposure to secondhand smoke. Child had also suffered seizures, but it was thought that he would grow out of them.

In March 2009, Father submitted to a psychological evaluation by Dr. Loretta Fuge, who evaluated him again in July 2010. Dr. Fuge's testimony was submitted via deposition, and certain documents she had prepared were offered as exhibits.[2] When Dr. Fuge first evaluated Father, he "really didn't understand why he was being [sic] there to

---

[2] The trial court held the record open for the parties to "depose one other witness and submit the deposition to the [trial] court." In May 2013, the deposition of "Loretta Fuge" was filed with the trial court. The judgment subsequently noted that

> [t]he case was continued for additional evidence, and by stipulation of the parties on June 5, 2013, the court received and admitted into evidence the following:
>
> > Exhibit A – Psychological Evaluation of [F]ather dated March 30, 2009;
> >
> > Exhibit B – Letter from Dr. Fuge regarding [F]ather;
> >
> > Exhibit C – Psychological Evaluation of [F]ather dated July 28, 2010;
> >
> > Exhibit 1 – [Clinic] records of [F]ather; and,
> >
> > Exhibit EE – Deposition of Dr. Loretta Fuge, Psy.D.

be evaluated." During that first interview, Father reported having "non-bizarre auditory hallucinations, meaning that that could be anywhere from hearing his name called to things like that." Father told Dr. Fuge that "he took anger management classes for depression but did not complete the course because he no longer needed them." Dr. Fuge thought that Father needed to complete an anger management class.

As a result of that first evaluation, Dr. Fuge diagnosed Father as having "Major Depressive Disorder, Recurrent, Severe with Psychotic Features[.]" Based on those diagnoses, she recommended that Father "consider co-parenting with a family member or other trusted, capable person." Dr. Fuge elaborated that this meant someone "being there [with Father] 24/7" and that "[i]t would be that the other person would be responsible for [Child,] and [Father] would assist in co-parenting."

In a letter dated April 20, 2009, Dr. Fuge stated that her recommendation regarding co-parenting meant that Father "would not be able to be the primary care giver of [Child] however he could assist with the parenting as long as the primary care giver is physically there." She stated that "it would not be advisable for [Father] to care for [Child] alone."[3]

A DSS Children's Division ("Division") caseworker, Olivia Walters, testified that Child was placed into "State custody" in May 2009 when the relative Child had been living with under the kinship diversion was no longer able to care for him. Ms. Walters "served as the case manager" for Child from that time until the end of 2011. When Ms.

_____

[3] Dr. Fuge's evaluation report for July 2010 stated that Father "appears . . . ready to regain custody of [Child] as his psychological issues are being managed effectively and [he] is learning parenting skills to provide a healthy environment." In her subsequent deposition, Dr. Fuge testified that this opinion was "[b]ased on [Father's] self-report of the improvements he has made[.]" She acknowledged that some conflicting information she had received during the deposition would affect her recommendations for Father, but she said she would need to reevaluate him to make a recommendation.

4

Walters was assigned the case, Mother and Father were no longer "a couple[,]" and Mother "was married to another individual[.]"

At Ms. Walter's first meeting with Father (which also involved other representatives from Division and the Juvenile Office), Father "became very angry" and seemed to lose his temper as evidenced by his yelling, cursing, and lack of cooperation. Father "left the meeting early" after refusing to sign any paperwork. Over the course of the case, Ms. Walters "prepared ten written service agreements" for Father. Father refused to sign three of those agreements.

The first goal of the various service agreements was "[t]o address the mental health concerns" of Father. In support of that goal, Father was asked to "participate in individual therapy and follow the recommendations of the therapist." During a period of "two and a half years[,]" Father "participated in three individual therapy sessions." Ms. Walters was not aware of Father being "successfully discharged from individual therapy[.]" Father was also asked to participate in anger management services. Ms. Walters received notifications on three separate occasions that Father "was dismissed from anger management classes for failure to attend." Ms. Walters reviewed records from a behavior health service and calculated that Father had attended anger management classes "[a]bout 25 percent of the time the classes were offered."

Father was expected to maintain contact with Child. All of Father's visits with Child were supervised during the time that Ms. Walters had the case. She personally observed about five or six of those visits "at the public library[,]" and she noted that "there was not a whole lot of interaction between" Father and Child. She also did not observe a display of affection between Father and Child. When Ms. Walters visited

5

Father's home, "the smell of cigarette smoke was obvious." Ms. Walters was also able to observe Child interact with his foster parents, and she believed that "[o]ver time" a bond had developed between Child and the foster parents. Financial support from Father to Child was in the form of fifty dollars per month withheld from Father's "Social Security check[.]"

Although Father participated in his in-person visitation with Child, Father made no efforts to maintain any contact with Child apart from those visits via telephone calls, cards, or letters. Ms. Walters testified that"[o]ther than establishing his residence," Father made no progress on the goals set forth in his service plans. She was not aware of "any other services" that Division could offer to Father "that would promote a reunification[.]"

Crystal Warren, a parent aide assigned to assist Father in June of 2009, provided those services to Father until the time of trial. Ms. Warren had been "train[ed] on parenting and attachment by . . . a licensed social worker[,]" and she had had taken college courses "deal[ing] with child and family development" and nutrition. She worked with Father on a weekly basis, and she generally supervised visits each week between Father and Child that lasted "[a]n hour and 40 minutes." Except for the period of time following the first day of trial in November 2012, Ms. Warren noted that "the constant cigarette smoke in the home was a concern."

Ms. Warren was to help Father learn "[p]roper nutrition, age-appropriate discipline, age-appropriate play, and child safety." Proper nutrition for Child "was a big concern" of Ms. Warren's because early on, when Child was 16 months old, Father gave Child "large amounts of Mountain Dew and candy[,]" and Child "would get extremely

6

hyper" after consuming them. Father eventually stopped giving Child Mountain Dew at every visit, but he still did so "on occasion." She also asked Father not to give Child fruit juice because it gave Child diarrhea. Despite that request, Father would "repeatedly give [Child] fruit juice[.]"

Regarding discipline, Ms. Warren worked with Father to practice "redirecting" Child, but Father "was never able to implement that correctly." Ms. Warren gave Father a video on using "time-outs" for discipline, but Father told Ms. Warren that "he didn't need to watch it." Father tried "to do a time out" by trying to hold Child on his lap or by holding Child down on the couch. This physical confinement caused Child to get more upset. Father then "got upset, and it became a big, huge tantrum." The technique Father used was not what Ms. Warren was trying to teach him. On a couple of occasions, Father was able to use a time-out appropriately, but he could not do so consistently. Ms. Warren also saw Father "smack [Child] on the leg a couple of times[,]" and one such incident occurred about a month before the final day of trial in December 2012.

According to Ms. Warren, Father's interaction with Child resembled that of a playmate instead of a parent, and on some occasions they played "too rough." When Father and Child played together, they would hit "each other too hard with whatever they're playing swords with[.]" On a couple of occasions, Father "pushed [Child] a little too hard off his lap[,]" causing Child to fall to the floor. She had "to remind [Father] pretty frequently that [Child] wasn't old enough to do something or he was too little to do that or . . . that [something] could hurt him."

Father's lack of awareness of potential threats to Child's safety was a continuing problem. Father left scissors and knives lying around, and Ms Warren "had to tell

7

[Father] several times to put . . . medicine up" because it was within Child's reach. Father used something like a "pill planner" to organize his medicine, and Child "would very easily be able to pop that open." On one occasion, Child got a syringe out of Father's pocket "and took the cap off." Father was able to get the syringe away from Child before "any harm happened."

A couple of months before trial, Father was taking a breathing treatment during a visit with Child. When Child asked Father what he was doing, Father said, "Here, do you want some? Do you want to take it?" After Ms. Warren explained that Father could not do that, Father rejected her concerns on the ground that Child used an inhaler. Ms. Warren responded by explaining that the medicine and dosage could be different for adults and children and that an inhaler was not the same thing as a breathing treatment. Even after giving the explanation, Ms. Warren remained concerned that Father was going to give Child "some of [Father's] breathing treatment."

At a visitation in a park, Child ran toward a busy street. Father yelled at Child to stop, but Father had trouble getting up to run after Child. Ms. Warren "took off and grabbed [Child]." On another occasion at the park, Father let Child "run back and forth on [a picnic table] bench" even though Ms. Warren warned Father several times that Child "was going to fall." Father "kept saying, 'I'm watching him. I'm watching him.'" Child did fall, but Father was able to "grab him before he hit the concrete[.]" On another occasion, after Child ran from a library with Ms. Warren giving chase, Father explained "that he just was too tired from the visit, he couldn't chase after [Child], [and] he couldn't go any faster to get [Child]."

8

Father let Child jump on a couch located next to a coffee table with a glass center, ignoring Ms. Warren's instructions to stop Child from doing so. Child "ended up falling, hitting his head on the corner of the coffee table[.]" Ms. Warren said that "even when [she] point[ed] out specific things that are a danger, [Father] doesn't listen or he [would] tell [her], 'I know how to take care of my child. I don't need you to tell me how.'"

On one occasion, Father was carrying Child by the arm while also trying to hold onto his own pants. Father stumbled, and he dropped Child to the floor in order to free his arms to "brace himself[.]" Child "hit his head very hard" and was taken for medical attention. Ms. Warren explained to Father that he should have "just dropped down to his knees or he could have let go of his pants, that you don't just drop your kid[.]"

For a four-month period of time, Father's niece was permitted to observe "the last hour" of visits instead of Ms. Warren. After this modification to the visits occurred, Child "started demonstrating very odd behaviors. . . . He started stuttering. He started having diarrhea." "And he started clinging onto . . . the foster parents when they would try to leave him at the visit . . . or he would hang onto their legs and . . . beg to go home with them."

Ms. Warren resumed full supervision of the visits, and after a while the behaviors stopped, except when Father became "upset." On several occasions, Father got upset with Ms. Warren, or just "upset in general," and he would scream and swear. This would make Child begin to stutter. Child would also become "very nervous and upset during that[,] and he would have . . . bowel movements in his pants." Child also "hid a lot" when Father was screaming.

Father was unable to reach a point where he was allowed to have unsupervised visits with Child. In testifying that such visits were not possible, Ms. Warren said that Father was unable to consistently implement what she had taught him.

> I gave [Father] all the tools. For instance, I gave him . . . information. I showed him. I explained to him repeatedly throughout the entire three years, and the response I got was either he ignored me or he told me, "I don't need you telling me how to raise my kid." I've done everything I could do.

Two weeks before trial, Father told Ms. Warren "that he was going to call his lawyer and talk to his lawyer about consenting, because he knew he couldn't take care of [Child] . . . fulltime, but he still wanted to be able to see [Child]."

Tianna Adams, another Division case manager, began working with Father in January 2012, and she remained the case manager at the time of trial. During Ms. Adams's tenure, Father "only attended one individual therapy session . . . [and] [h]e only attended three anger management sessions. He refused to complete an updated bonding assessment. He refused to complete an updated psych[ological] eval[uation]." Ms. Adams had prepared four written service agreements for Father, two of which Father had refused to sign.

Ms. Adams observed Father interacting with Child during "about six to seven" supervised visits, and she described their interactions as being "like a sibling interaction." She also contrasted Father's interactions with Child to her observations of Child's interaction with his foster parents, which she characterized as a more "parent-child type interaction." According to Ms. Adams, Father "would get upset if [Child] had a cooler toy than him. They would bicker at one another[.] [Father] would say that [Child's] shoes were ugly."

10

Ms. Adams testified that Father's home smelled of cigarette smoke on different occasions. She also observed that during visits in the home when Child was present, medicine, lighter fluid, sharp knives, and insulin syringes would be located where Child could get to them. Father requested and received additional parenting time, but "due to behavioral problems with [Child] as a result of this additional visitation[,]" the extra visits were stopped. In Ms. Adams's opinion, there were no additional services that Division could offer Father that would "facilitate reunification[.]"

Dr. Betty A. Schlesing, a psychologist, prepared a bonding assessment of Father and Child in March 2011. Father was "over an hour late for the session[,]" which caused Child to wait "a long time." As a part of the assessment, she observed an interaction between Father and Child that would normally have lasted an hour, but she stopped it early because Child was showing "distress[.]" It was clear to Dr. Schlesing that Child "did not want to be there, that he was not attached in any way to [Father] . . . and [that Child] wanted to get away and was doing everything in his power to get away."

Dr. Schlesing utilized a "Parenting Stress Index" test that indicated Father "perceive[d] his interactions with [Child] as failing to produce good feelings about himself, and he perceive[d] his feelings as being rejected by [Child]." Father's test results were indicative of a situation that would make it difficult for a parent and child to bond with one another. As to whether Child's being in foster care was a likely contributor, Dr. Schlesing testified that it would not necessarily "preclude a bond with the biological parent[.]" She opined that "the prognosis is poor" for the "repair or facilitat[ion of] a parent-child bond between [Father] and [Child.]"

11

Dr. Schlesing evaluated Father again in June 2011 "to assess [his] mental, emotional, and behavior functioning and parenting skills." Dr. Schlesing administered seven tests to Father. She determined that Father had "very low intellectual functioning [and was] mildly mentally retarded." She stated that "[i]t would be difficult for [Father] throughout the years . . . to help [Child] with any schoolwork. . . . [and] it would be very difficult for [Father] to teach [Child] . . . social skills, reasoning skills, [and] knowledge of cause-and-effect relationships."

Father also "had anger difficulties" and "aggressive feelings" that revealed "[p]oor frustration tolerance[.]" Dr. Schlesing opined that Father had "bipolar disorder," and she could not "rule out the probability of a schizoaffective disorder[.]" Her written report, admitted into evidence as Division's Exhibit 2, specifically stated that in Father's case, "one cannot rule out the strong possibility of a Schizoaffective Disorder of the Bipolar type." She also found that Father had "narcissistic personality features." Dr. Schlesing opined that someone with Father's "mental disorders" would be unable to empathize with his child.

Dr. Schlesing did testify that it is possible to regulate mood swings through medication if the medicine is consistently taken. However, she regarded Father's mental conditions as "permanent," and she stated that someone with Father's disorders "would have difficulty managing [the disorders] through counseling and medication[.]" Father disclosed that he had diabetes, and Dr. Schlesing testified that it is "very important" to regulate the diet for diabetes because "[d]iabetes increases depression. Diabetes increases mood swings."

According to Dr. Schlesing, Father would require help "continually. That means 24/7." Without such help, there was a "very serious" risk that "[C]hild would not develop mentally, emotionally. [Child] would have academic problems as well. [Child] would begin to rebel and [Child] would not have a regular, structured schedule." In an attempt to find a suitable co-parent for Father, Division had contacted "an ex-sister-in-law, [Father's] brother, and [Father's] own biological sister[,]" but the ex-sister-in-law was unable to assist due to complications in her own life, and the other two relatives declined assistance.

Dr. Schlesing confirmed that she had earlier reported that she could not recommend that Child be placed in Father's "care and custody" until he was "able to change his parenting style" and that the prognosis for such change was poor. It was Dr. Schlesing's opinion that Father's psychological conditions "render[ed] [him] unable to perform the necessary responsibilities to ensure [the] health, safety, and welfare of [Child.]"

Father testified at trial. He recalled the incident when he had taken Child to the hospital, but he said that he had not seen the bruises on Child's back until Child's clothing was removed at the hospital. Father said he did not cause the bruises and he did not know who did.

Father testified that he suffers from diabetes, anemia, "congestive heart failure," high blood pressure, and "COPD." At the time of trial, Father was also taking medication for depression. Father agreed that he spent "a lot of time in the reclining chair and that [he] and [Child] play and wrestle . . . in that chair[.]" When asked if he did not "feel like interacting in any other way[,]" he replied, "A lot of time my foot hurts and I can't get--go

13

in there and play, but I mean, I do get up and go in there and play with him." Father also acknowledged that he "learned how to . . . watch what you eat, to feed [children,]" but he stated, "Of course, I didn't do that great on that, but I did you know, learn. And I should have done better."

Father admitted that he had "been in and out of the anger management group" "more than two" times. Father acknowledged that he first participated, before Child was born, in an "anger management group after a suicide attempt[.]" He admitted that he told a medical practitioner in March 2011 that he still had trouble controlling his temper at times. Father characterized his participation in individual counseling sessions as "off and on[.]"

The findings in the trial court's judgment included that

> [Child] has been in foster care at least fifteen of the most recent twenty-two months; [Child] has been under the jurisdiction of the Juvenile Court for a period of one year; conditions of a potentially harmful nature continue to exist; there is little likelihood that these conditions will be remedied at an early date so that [Child] can be returned to [Father] in the near future; and, the continuation of the parent-child relationship greatly diminishes [Child's] prospects for early integration into a stable and permanent home.

This appeal timely followed the entry of that judgment. Additional findings by the trial court will be discussed in the context of our analysis of Father's points.

**Applicable Principles of Review and Governing Law**

We will uphold the judgment of the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re B.H.*, 348 S.W.3d 770, 773 (Mo. banc 2011). We will reverse the judgment "only if we are left with the firm belief that the [decision] was wrong." *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005) (internal quotation omitted). "An

14

appellate court defers to the trial court's ability to judge the credibility of the witnesses and will review conflicting evidence in the light most favorable to the trial court's judgment." *In re J.D.P.*, 406 S.W.3d 81, 83 (Mo. App. E.D. 2013).

"The trial court must follow a two-step analysis in deciding whether to terminate parental rights. In the first step, the court must consider whether the statutory termination grounds have been proven by clear, cogent, and convincing evidence." *In re S.J.H.*, 124 S.W.3d 63, 66 (Mo. App. W.D. 2004). "[B]ecause parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *S.M.H.*, 160 S.W.3d at 362. "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *Id.* "This standard of proof may be satisfied even though the court has contrary evidence before it or the evidence might support a different conclusion." *In re L.N.D.*, 219 S.W.3d 820, 825 (Mo. App. S.D. 2007). Thus, if "the evidence poses two reasonable but different inferences, this [c]ourt is obligated to defer to the trial court's assessment of the evidence." *C.M.B.R.*, 332 S.W.3d at 815. "'Greater deference is granted to a trial court's determinations in custody and adoption proceedings than in other cases.'" *Id.* (quoting *In re S.L.N.*, 167 S.W.3d 736, 741 (Mo. App. W.D. 2005)).

"If the first step is satisfied, the trial court proceeds to the second step and determines whether termination of parental rights is in the best interest of the child." *In re M.J.H.*, 398 S.W.3d 550, 559 (Mo. App. S.D. 2013). "On that question, the standard of proof at trial is a preponderance of the evidence, and the standard of review on appeal

15

is abuse of discretion." ***In re P.L.O.***, 131 S.W.3d 782, 789 (Mo. banc 2004). "It is the duty of the trial court to weigh the evidence presented relating to best interest, and we will not reweigh that evidence." ***In re H.N.S.***, 342 S.W.3d 344, 351 (Mo. App. S.D. 2011).

## Analysis

### *Point III is Deemed Abandoned*

For convenience, we address Father's last point first. It contends the trial court "should not have terminated [Father's] parental rights under [section] 211.447.5 as there was not substantial evidence to support the judgment." If Father intended this point to cover different ground than that addressed in his first point, it fails to do so; the argument section of Father's brief does not address the claim made in Point III.

"An appellant must develop the contention raised in the point relied on in the argument section of the brief. If a party does not support the contention with relevant authority or argument beyond conclusory statements, the point is considered abandoned." ***In re T.E.***, 35 S.W.3d 497, 506 (Mo. App. E.D. 2001) (citation omitted). Point III fails.

### *Point I – Evidence Supporting Failure to Rectify*

Father's first point contends "there was no clear, cogent and convincing evidence that" Father failed to rectify the circumstances surrounding Child's placement in protective custody ("failure to rectify").[4] The relevant statutory ground is set forth in section 211.447.5(3), which provides that termination for failure to rectify is appropriate if:

---

[4] Although Father's first point asserts the wrong standard of review (invoking the "clear, cogent and convincing evidence" standard of proof applicable in the trial court instead of the "supported by substantial evidence" standard of review applicable on appeal), Father does cite the correct standard of review in this third point, and we will apply it to review his first point on the merits.

16

The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, *or conditions of a potentially harmful nature continue to exist*, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

(Emphasis added.)[5]

In determining whether to terminate parental rights for failure to rectify, the trial court is required to consider and make findings on the following:

(a)     The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b)     The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c)     A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d)     Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.[6]]

*Id.*

---

[5] Father's point ignores this highlighted alternative means by which failure to rectify may be proven under section 211.447.5(3), and we will affirm the trial court's judgment if either prong was supported by substantial evidence.

[6] Division maintained in its first amended petition that "[t]here is no evidence that [Father] suffers from an untreatable chemical dependency" and the trial court found that "there is no evidence as to any chemical dependency."

"[I]t is the continued existence of an unremedied, neglectful situation that is the ultimate issue." *In re J.K.*, 38 S.W.3d 495, 500 (Mo. App. W.D. 2001). The factors listed under section 211.447.5(3) "are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *In re K.K.*, 224 S.W.3d 139, 150-51 (Mo. App. S.D. 2007) (construing a former version of statute at subsection 211.447.4(3)).[7]

Father does not contest that Child "has been in the custody of the juvenile court for a period of over a year."[8] Father contends that termination is inappropriate because he made progress with the social service plans, "DFS"[9] "failed in offering aid to [Father] and [Child,]" and his "mental conditions [are] not of such a nature to make him unfit as a parent." The basic problem with Father's argument is that it is based upon his preferred view of the evidence; it thereby fails to appreciate and account for our obligation to defer to the "trial court's assessment of the evidence." *C.M.B.R.*, 332 S.W.3d at 815. Despite this critical defect, we will address, *ex gratia* (and applying the appropriate standard of review), Father's contentions in the order presented.

*Section 211.447.5(3)(a) – Compliance with Social Service Plans*

Concerning Father's progress on his service plans and Division's provision of services, the trial court found:

---

[7] Before 2007, what is now section 211.447.5 was numbered 211.447.4. S.B. 84, section A, Legis. Serv. (Mo. 2007) (Vernon's). For the remainder of this opinion, we will cite cases addressing the failure to rectify ground without any further reference to any difference in numbering.

[8] Father does assert that the conditions which caused Child to come into the custody of the juvenile court have abated in that Father was not identified as the perpetrator of Child's bruises and Father no longer lives with the other persons who also resided in the home at the time Child was injured. The trial court did not rely on the fact that "the conditions which led to the assumption of jurisdiction still persist," section 211.447.5(3), in entering its judgment. The trial court found instead that "conditions of a potentially harmful nature continue to exist[.]"

[9] Father refers to Division as "DFS" -- an acronym for "Division of Family Services" (a previous name for what is now known as the Children's Division). We treat all references to "DFS" as references to Division.

Additional services would not facilitate reunification with [Child], nor bring about a lasting parental adjustment. [A Division] case worker testified that [F]ather has received all services available and has failed to avail himself of the services offered and failed to make progress toward the service plan goals. The caseworkers testified that additional services would be futile.

The trial court also found that Father "fail[ed] to implement the parenting skills taught by the parent aide"; "fail[ed] to actively participate in anger management and counseling sessions"; and "failed to take advantage of the services that he agreed to do[.]" The trial court concluded that "there is no likelihood that [Child] can safely be returned to [Father's] house."

When addressing progress on a social service plan, it is not necessary that a parent show "full or substantial compliance[,]" *In re I.G.P.*, 375 S.W.3d 112, 121 (Mo. App. W.D. 2012); "the issue in termination of parental rights cases is whether *progress* has been made toward the plan goals[.]" *Id.*

Father points to trial testimony that he established his own residence and "set up" one of the rooms for Child. He argues that he completed some assessments, and he notes that there was testimony that he went "to some individualized treatment for anger management with [a service provider]." He maintains that he "took some parenting classes" and he "did work with the parenting aid[e] about half of the time." He argues that his acknowledgement at trial "that he should have done better with the food he provided to [Child]" "indicate[d] a willingness to work on" that issue. Father also contends that Division failed him by "never" defining what constituted completion of anger management training or therapy or setting goals for his therapy. He further faults Division for not always using a "trained therapist" to supervise all of his visits with Child,

19

as suggested by Dr. Schlesing, and using instead only the caseworkers in a minority of the supervised visits.[10]

Even if the trial court credited all of Father's favorable testimony (something it was not required to do), substantial evidence supported the trial court's findings regarding Father's progress (or lack thereof) in meeting the goals of the service plans. Ms. Walters testified that while she had the case, Father had not made progress toward the service plan goals except for establishing a residence, and she was not aware of "any other services" that could be offered to Father "that would promote a reunification[.]" While Ms. Walters had the case, Father "was dismissed from anger management classes for failure to attend" on three separate occasions. During a period of "two and a half years[,]" Father "participated in three individual therapy sessions."

Ms. Adams also testified that there were no additional services that could be offered which would "facilitate reunification[.]" While she managed the case, Father attended only "one individual therapy session" and "three anger management sessions."

Ms. Warren, the parent aide, testified that Father admitted to her that he could not care for Child on his own, and Father was not able to consistently implement the skills she had tried to teach him. She was concerned about Child's safety because she repeatedly had to tell Father "to put . . . medicine up" that was within Child's reach; Father offered to let Child take some of Father's breathing treatment; and Father was not responsive to dangerous situations involving Child such as dropping him, letting him play on unsafe items like a coffee table and picnic bench, and failing to retrieve Child as he ran toward the street. These behaviors demonstrated that Father was not assimilating the

---

[10] Dr. Schlesing testified that for purposes of maintaining a parent-child bond, a "therapist who is trained in formulating attachments" would be necessary for visitations that were less than two hours per week.

services Ms. Warren was providing. When a parent refuses "to cooperate with and fail[s] to progress in services offered, the court may find that additional services would be useless." *In re R.A.*, 913 S.W.2d 142, 146 (Mo. App. W.D. 1996).

*Section 211.447.5(3)(c) – Father's Mental Condition*

In *In re K.A.W.*, 133 S.W.3d 1, 14 (Mo. banc 2004), our high court laid out the following framework for analyzing a claim that a parent's mental condition supports a termination based on failure to rectify:

> [A] mental or emotional condition must be analyzed in three prongs to make an adequate finding: (1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control.

This analysis "requires a showing of more than merely the presence of mental or emotional instability or problems; the incapacity must be so severe that it renders the parent incapable of providing minimally acceptable care and the condition cannot be reversed or improved in a reasonable time." *S.M.H.*, 160 S.W.3d at 371. "A termination of parental rights on grounds of mental illness requires substantial evidence that the incapacity is so severe that it renders the parent incapable of providing minimally acceptable care." *In re L.J.D.*, 352 S.W.3d 658, 664 (Mo. App. E.D. 2011).

Concerning Father's mental condition, the trial court found that "[F]ather suffers from a mental condition which is permanent and renders him unable to knowingly provide [Child] with necessary and safe care." The trial court made additional, specific findings, including that in June 2011:

> [Dr. Schlesing] diagnosed [F]ather with Bipolar Affective Disorder with a strong possibility of a Schizoaffective Disorder of the Bipolar Type, mild

21

mental retardation and Narcissistic Personality Features.  Dr. Schlesing concluded that [F]ather has poor frustration tolerance, poor impulse control, and poor ability to modulate emotions.  She further concluded that placement of a child in his home would place the child at risk for potential child abuse.

The trial court also noted other findings by Dr. Schlesing, including "that [F]ather has an anger issue[,]" his "prognosis for change is poor[,]" and that "[F]ather's mental conditions are permanent and render him unable to perform the tasks necessary to adequately parent and ensure the health, safety and welfare of [Child]."

Father asserts that his mental condition does not support a failure to rectify finding, arguing that the documentation of his condition is wanting in that there are some differences in the findings of some of his evaluators and service providers regarding his IQ, Dr. Schlesing indicated that his bipolar order "could be controlled through medication[,]" and a diagnosis suggesting "the possibility of schizoaffective disorder of the bipolar type" was "not well supported by the record as neither Dr. Fuge nor [Father's medical records from a behavioral center] ever mention anything about [Father] suffering from this."

Father argues that "character flaws and low social skills may prevent [him] from being the best parent, but [these things do] not mean that he cannot be a parent."  Father also contends that the finding regarding the duration of his conditions is flawed because Dr. Fuge noted that Father can change.  Finally, he argues that the severity of the effect of his mental conditions was a matter of disagreement between Dr. Fuge and Dr. Schlesing.  Based on the following evidence and our standard of review, we disagree with these assertions.

Dr. Schlesing diagnosed Father with bipolar disorder, she found Father to have "narcissistic personality features[,]" and her written report stated that "one cannot rule out the strong possibility of a Schizoaffective Disorder of the Bipolar type." She opined that Father "had anger difficulties" with "aggressive feelings" that demonstrated "[p]oor frustration tolerance[.]" Dr. Schlesing opined that someone with the same "mental disorders" as Father had would be unable to empathize with his own child. Contrary to Father's characterization of Dr. Schlesing's testimony, she opined that mood swings could be "managed through medication provided if it's consistently adhered to as prescribed[,]" but someone with Father's disorders "would have difficulty managing this through counseling and medication[.]

Dr. Schlesing testified that Father would need assistance all the time -- "24/7" -- in order to care for Child, and Father's condition was permanent[.] She did not recommend placing Child in Father's care until he changed his parenting style, and she opined that the prognosis for such change was poor[.] The report of her psychological evaluation of Father concluded that "[Father] will not be able to adequately parent [Child]."

Although one of Dr. Fuge's psychological evaluations indicated that Father had progressed to the point of caring for Child, the doctor acknowledged in her deposition that she was solely relying on information she received from Father in making that assessment. More importantly, we are "obligated to defer to the trial court's assessment of the evidence." *C.M.B.R.*, 332 S.W.3d at 815. It is the function of the trial court to weigh the value of competing opinions, and the trial court's standard of proof of clear, cogent and convincing evidence may be met even when there is contrary evidence.

23

*L.N.D.*, 219 S.W.3d at 825.[11]   Here, substantial, competent evidence supported the trial court's conclusion that Father's permanent mental condition deprived him of the ability to provide Child with the proper care, custody and control.

Finally, we are mindful that "[e]ven a mental condition that renders a parent unable to provide adequate care for a child alone does not provide a basis for termination if the parent has access to additional support because parenting is frequently 'a group effort.'" *L.J.D.*, 352 S.W.3d at 664.   Here, the assistance Father received from a niece in supervising visits was not enough to overcome the problems that the visits produced for Child.   Even with a trained parent aide supervising the visits, Father would at times become so upset that he would scream and swear to the point that Child would become so nervous that he stuttered, defecated in his clothing, and hid from Father.   Finally, none of the three individuals Division had contacted about assisting Father with Child were willing or able to do so, and, in his testimony, Father did not identify any other such person or persons who could help him parent Child.

Point I is denied.

*Point II – Best Interest Determination*

"A trial court's determination regarding whether termination of parental rights is in the best interest of the child is a subjective assessment based on the totality of the circumstances[,]" *L.J.D.*, 352 S.W.3d at 662, and we do not reweigh the evidence supporting that assessment.   *See H.N.S.*, 342 S.W.3d at 351.

---

[11] Father makes an additional argument that his previous "suicide attempts do not show current mental conditions that support the judgment."  The judgment did reference that "[F]ather testified that he has attempted suicide in the past[,]" and it referred to the medical records supporting Father's testimony.  The references to Father's suicide attempts are included with other facts supporting the trial court's finding that Father suffered from a mental condition.  The judgment does not find that Father is at a current risk of suicide so as to be unable to care for Child.

Section 211.447.7 provides specific factors that the trial court must consider and make findings on when determining whether a termination of parental rights is appropriate.[12] Father's argument that the trial court abused its discretion in finding that termination was in Child's best interest goes through the statutory factors and highlights evidence he believes is favorable to his position, ignores evidence favorable to the judgment, and (based on that faulty procedure) urges that there is a "lack of evidence" to support the trial court's conclusion that "[t]ermination of the parental rights of [Father] is in [Child's] best interest so that [Child] can remain or be placed in a stable and permanent home."

The trial court found that some of the statutory factors did favor Father. Father was found to have maintained regular visitation, he did not have a felony conviction, and

---

[12] Section 211.447.7 provides:

When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 4 of this section or subdivision (1), (2), (3) or (4) of subsection 5 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

25

he provided $50 per month in financial support for Child from his Social Security check. Although the trial court appropriately recognized these laudable actions, such findings are insufficient to support Father's argument because

> [t]here is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination. Rather, a finding that termination is in the child's best interest is a subjective assessment based on the totality of the circumstances.

*In re C.A.M.*, 282 S.W.3d 398, 409 (Mo. App. S.D. 2009).

Before reaching its best interest finding, the trial court specifically found that "there is a lack of emotional ties between [F]ather and [C]hild." It found that Dr. Schlesing conducted a bonding assessment, that Father "was over an hour late to the assessment[,]" and Dr. Schlesing "testified that it appeared [Child] did not want to be around [F]ather. [Child] ran to the foster mother when given the opportunity, demonstrated anger in being there, and showed no attachment to [Father] in any way."[13]

The trial court also found that although Father visited Child regularly, "[F]ather has not been able to progress past [supervised] visitation. He has not been able to meet the ongoing physical, mental, and emotional needs of [Child]." The trial court found "[F]ather has not . . . provided any cards, letters, or clothing while [Child] has been in care."[14] The trial court found that Father "demonstrated a disinterest in and lack of commitment to [Child] in that he has failed to consistently participate in individual therapy, anger management classes, and has not shown improvement in his parenting skills as taught by the parent aide[.]" The trial court credited evidence from Ms. Warren

---

[13] Father argues that there was no recommendation from the guardian *ad litem* and no expert testimony about whether Child had bonded with the foster parents. Father cites no authority for the proposition that such evidence was necessary.

[14] A reference to Father not providing clothing was not found in the trial transcript; Ms. Adams testified she did not recall whether there was clothing in the room Father had prepared for Child.

"that [F]ather was unable to recognize dangerous situations and protect [Child] from same."  As discussed above, the trial court also found that "[a]dditional services would not facilitate reunification with [Child], nor bring about a lasting parental adjustment" and "there is no likelihood that [Child] can safely be returned to [Father's] house."  Under the totality of the circumstances as found by the trial court, it did not abuse its discretion in deciding that termination was in Child's best interest.[15]

Point II is also denied, and the judgment terminating Father's parental rights is affirmed.

DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS

---

[15] The trial court's finding regarding whether Father supplied clothing to Child was not critical to its finding that the totality of the circumstances indicated that termination was in Child's best interest.