109 S.W.3d 702 (2003)
In the Interest of C.N.G.
No. WD 62428.
Missouri Court of Appeals, Western District.
July 22, 2003.
*704 Jack A. Lewis, North Kansas City, for Appellant.
John R. Shank, Kansas City, for Respondent.
PAUL M. SPINDEN, Presiding Judge.
M.G.S. appeals the circuit court's judgment, which terminated her right to parent her son, C.N.G.[1] The circuit court terminated her rights pursuant to § 211.447.4(3), RSMo 2000, after finding that she did not comply substantially with the Division of Family Services' written service agreements. We reverse the circuit court's judgment in part.
On April 20, 2000, the circuit court assumed jurisdiction of C.N.G. under § 211.031.1(1), RSMo 2000, after it learned that M.G.S. had been abusing prescription drugs, had left C.N.G., then two years of age, in the care of her 12-year-old son for extended periods without informing him where she was or how she could be reached, and that M.G.S. did not provide for care of the boy after she was arrested and incarcerated briefly. The circuit court placed C.N.G. in DFS' custody for placement in M.G.S.' home.
A few days after the placement, M.G.S. broke into a neighbor's house, stole prescription medications, and ingested them. A psychologist concluded that M.G.S. was suffering mental conditions that made her a danger to herself and her children. M.G.S.' guardian admitted her for in-patient substance abuse treatment. Because this admission left C.N.G. without care, the circuit court ordered DFS to place him in foster care.
While M.G.S. lived in a group house during May 2000 as part of her treatment, DFS permitted her to visit C.N.G. under its supervision for an hour each week. As M.G.S.' treatment progressed, she moved into her own apartment, and DFS permitted the visits to be longer and more frequent. Eventually DFS permitted the visits to be unsupervised and overnight in M.G.S.' apartment.
Later, the circuit court permitted M.G.S. to be reunited with her older son, but it continued DFS' custody of C.N.G., permitting M.G.S. to visit C.N.G. from Sunday to Tuesday each week. During those visits, M.G.S. adequately met C.N.G.'s needs. M.G.S. remained bonded with her son and expressed love for him.
Before October 2001, DFS considered M.G.S. to be progressing sufficiently that reunification was imminent. She had progressed from weekly, one-hour supervised visits to weekly, three-day unsupervised visits. Before recommending reunification, DFS required her to agree to accomplish goals that DFS set concerning parenting skills. DFS assigned a parent aide to assist her in developing those skills.
On October 10, 2001, M.G.S.' psychiatrist at Tri-County Mental Health Services, whom she had been seeing for four months, changed her medications and prescribed Ambien to induce sleep. M.G.S. later admitted that she took as much as four times the prescribed dosage at times.
Three days after starting Ambien, at a time when C.N.G. was not at her apartment, M.G.S. fell down a flight of stairs. She said that she could not remember the fall or any of the surrounding circumstances. As part of the hospital treatment *705 of the injuries that she sustained in the fall, hospital physicians gave her a pack of Vicodin, a narcotic that she had previously abused.
The day after the fall, M.G.S. called her parent aide and told her about the fall and her inability to recall the event or occurrences surrounding it. M.G.S. also told the aide that she was taking a new sleeping pill prescribed by her psychiatrist and that hospital physicians had given a pack of four to six Vicodin pills to her.
The next day, the aide and a DFS social worker visited M.G.S. She told them that she could not remember taking the Vicodin. The Vicodin pack was empty, and M.G.S. acknowledged that she probably had taken them. She told the aide and social worker that she had discarded the Ambien because she did not like the way they made her feel and because she did not want her older son and his visiting friend to find them. Because she had discarded the Ambien bottle, the aide and social worker could not determine how much she had taken.
The juvenile office filed a petition to terminate M.G.S.' right to parent C.N.G. on January 17, 2002, and DFS immediately terminated M.G.S.' visitations with her son. The circuit court entered its judgment terminating M.G.S.' parental rights to C.N.G.[2] M.G.S. appealed, and we reversed and remanded the judgment on the ground that the circuit court did not make sufficient findings of fact required under § 211.447.4(3), RSMo 2000. In re C.N.G., 89 S.W.3d 564 (Mo.App.2002). On January 10, 2003, the circuit court issued its amended judgment, and M.G.S. appeals again.
In a termination proceeding, the circuit court, before considering the child's best interest, must determine whether the juvenile officer has proven a statutory ground for termination by clear, cogent, and convincing evidence. Evidence is clear, cogent, and convincing if, when weighed against all of the evidence, it instantly tilts the scales in favor of termination. We review the circuit court's judgment by determining whether it is supported by substantial evidence, is consistent with the weight of evidence, or accurately declares and applies the law. In re D.C.S., 99 S.W.3d 534, 538 (Mo.App. 2003). We review termination of parental rights cases closely because termination of parental rights interferes with a basic liberty: freedom from governmental interference with family and child rearing. In re P.C., 62 S.W.3d 600, 603 (Mo.App.2001). "`Terminating parental rights is an exercise of an awesome power and should not be done lightly.'" Id. at 602-03 (quoting In the Interest of T.H., 980 S.W.2d 608, 613 (Mo.App.1998)).
In determining whether to terminate parental rights for a failure to rectify under § 211.447.4(3), the circuit court must make findings of fact as to the conditions specified in subparagraphs (a) through (d). In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000). Section 211.447.4(3) authorizes the circuit court to terminate a parent-child relationship when:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at *706 any early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
In making the required findings in this case, the circuit court ruled that M.G.S.' mental conditions were not relevant to its judgment because they were not untreatable and did not prevent her from providing the necessary care, custody and control of C.N.G. It ruled that her recent drug abuse did not rise to the level of chemical dependency that would render her unable to act as a responsible parent. Instead, the circuit court rested its judgment on §§ 211.447.4(3)(a) and (b). The circuit court's amended judgment said:
[M.G.S.] has been presented with multiple Written Service Agreements by the Clay County Division of Family Services which were designed to aid and cause her to rectify conditions in order that the child could be returned to a parent. The mother has failed to substantially comply with the terms of the various Written Service Agreements, as more particularly described as follows:
(1) ... [M.G.S.] failed to comply ... by not following the recommendations of the assigned parent aide and therapist[.] A parent aide was assigned to [M.G.S.] to aid her in learning the basic skills necessary to properly care for her son such as setting and maintaining appropriate boundaries and rules to ensure the child's safety. [M.G.S.] would not complete the assignments given to her by the parent aide stating she was too tired or too busy to attempt the assignments. [M.G.S.] maintained regular visits with her son; however, she did not follow the instructions and recommendations of the parent aide during the visits, in regards to such important matters as discipline, supervision, and constructive interaction with her son. Similarly, [M.G.S.] attended her therapy appointments but did not follow recommendations to remain free from addictions to substances; she failed to consistently attend a substance support group and take responsibility for and managing her mental health needs through medication compliance; she failed in effective communication with her psychiatrist and failed to follow the recommendations of mental health professionals with whom she had contact. Additionally, [M.G.S.] also failed to provide any financial support for the child.

*707 (2) ... [M.G.S.] failed to ... fulfill a third directive to follow the recommendations of her Guardian and Tri-County worker[.] ...
...
(5) ... Following a relapse of abuse of prescription medication, [M.G.S.] was asked by her therapist and guardian to voluntarily attend a daily substance abuse program. [M.G.S.] did not comply with this request until such time as her guardian stated [M.G.S.] would be removed from her apartment and placed in respite care unless she was attending the substance abuse group daily.
(b) The Division of Family Services has offered aid to the mother on a continuing basis in an attempt to adjust her circumstances or conduct to provide a proper and safe home for the child as more particularly described as follows:
(1) The Division of Family Services attempted to assist the mother by entering into Written Service Agreements beginning on March 29, 2000 and ending January 23, 2002, to adjust the mother's circumstances or conduct and to provide a proper home for the child, but the mother failed to comply;
(2) The Division of Family Services offered counseling, a parent aide, parenting classes, substance abuse counseling and treatment, and mental health treatment. The Clay County Public Administrator's Office offered a case manager through Tri-County Mental Health Service and assumed responsibility for all [M.G.S.'] financial affairs but all aid failed to accomplish a sufficient change in [M.G.S.'] behavior so that she could maintain a proper home for her child.[3]
For a parent's failure to comply with her agreements with DFS to be a sufficient ground for terminating her parental rights under § 211.447.4(3), her shortcoming must demonstrate that one of the three conditions set out by the General Assembly in § 211.447.4(3) exists. Indeed, the General Assembly instructed, "In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on" whether the circumstances outlined in subsections (a) and (b) existed. In other words, a parent's failure to comply with a written service agreement does not, in itself, constitute a ground for terminating parental rights. N.M.J., 24 S.W.3d at 778. It is merely a factor to consider in deciding whether the grounds set out in § 211.447.4(3) exist. See, e.g., In re A.S., 38 S.W.3d 478, 483-85 (Mo.App.2001).
Moreover, the General Assembly did not mandate in § 211.447.4(3) that failure to comply with a written service agreement[4] was what the circuit court was to focus onnot even whether the parent's noncompliance was substantial. The General Assembly instead mandated that the circuit court consider "the extent to which the parties have made progress in complying with [the service agreement's] terms." The issue is whether or not progress has been made toward complying with the service agreementsnot whether or not the compliance was full or substantial.
The circuit court found only that M.G.S. had "failed to substantially comply with the terms of the various Written Service *708 Agreements[.]" Considering the evidence and its reasonable inferences in the light most favorable to the circuit court's judgmentas we are obligated to do, In re J.W., 11 S.W.3d 699, 703 (Mo.App.1999) we have no doubt that M.G.S. failed to comply fully with the agreements. She did not follow all of the parent aide's recommendations as she had agreed to do. The parent aide testified, "[M.G.S.] consistently recognizes that setting rules, setting limits, having consequences, having rewards, having plans for dealing with issues are things that are important. But [M.G.S.] has a very difficult time following, you know, setting up those plans, following through and being consistent with her training, her discipline, her limits."
But, contrary to the circuit court's conclusions, the juvenile officer did not establish clearly, cogently, and convincingly that M.G.S. was not making progress in complying with the service agreements. Indeed, the overwhelming evidence was that she was making good progress up to October 2001, when the Ambien and Vicodin incidents occurred. As M.G.S. had progressed, DFS increased the frequency and duration of her visits with her son, and DFS deemed reunification to be imminent. The juvenile officer said that M.G.S. was making reunification her life's work and that she would not have pursued termination had the Ambien incident not occurred.
The drug incidentnot M.G.S.' failing to abide completely with her agreements with DFSobviously was what caused DFS to "pull the plug" on reunification. The circuit court, however, did not deem the drug incidents to be sufficiently significant as to warrant termination of the parent-child relationship.
Nevertheless, the weight of evidence does not support the circuit court's finding that M.G.S. failed to follow the parent aide's recommendations concerning supervision and constructive interaction with C.N.G. While a volunteer testified that C.N.G. watched television as M.G.S. napped on the couch and played by himself in his bedroom, the record does not indicate that M.G.S. failed to supervise C.N.G. in accordance with the instructions of her parent aide. Neither does the evidence support a finding that M.G.S. failed to interact constructively with C.N.G. in a manner instructed by the parent aide. Aside from M.G.S.' taking C.N.G. to "story time" at the local library only twice, the evidence concerning their interaction was that M.G.S., with one brief exception, engaged in creative and playful activities with C.N.G. during the two year period that she was receiving DFS' assistance. The parent aide testified:
Q. Did [M.G.S.] ever prove to you or demonstrate in your presence any stimulating activity with [C.N.G.]?
A. She, over the two-year-period of time we've worked together, yes, she has. In hershe had an assignment that for starting on in September, she was to have [C.N.G.] for three days. And in that three-day-period of time, she was supposed to present learning activities, play activities, and tell me what they were going to do together and actually do them. And in that period of time, she did not. In the two-year-period of time, I have seen her do creative and play activities, yes.
The circuit court also concluded that M.G.S. had not met the obligations of her written service agreements concerning issues surrounding her mental health and substance abuse treatment. Contrary to the circuit court's finding, the evidence does not support a finding that she did not remain free from addiction to substances. Even when viewed in the light favorable to the judgment, her taking excessive dosages *709 of Ambien in October 2001, especially in light of the absence of any evidence suggesting any other abuse of prescription drugs after May 2000, did not establish that M.G.S. remained addicted to prescription medications. The Ambien incident established that M.G.S. had exercised bad judgment, but it did not establish that she remained an addict. Furthermore, the juvenile officer did not present any evidence that M.G.S. had abused the Vicodin that physicians had given her. Although a social worker assumed that M.G.S. took the pills "fairly quick" because she got them on a Saturday and they were gone by the following Monday, nothing in the record enlightened the circuit court concerning the prescribed dosage or supported a finding that the four to six pills during that time was not an acceptable dosage.
The evidence also did not support the circuit court's findings that M.G.S. failed consistently to attend a substance support group, manage her mental health needs through medication compliance, effectively communicate with her psychiatrist, and follow the recommendations of her guardian and mental health professionals. To the contrary, M.G.S.' psychiatrist testified that she met all of her appointments, took her medications as prescribed, and followed his suggestions. Although a social worker testified that M.G.S.' first therapist apparently had "concerns about her," the nature of those concerns were never identified and were of no significance. M.G.S.' current therapist testified:
Q. [M.G.S.' second goal] was to take responsibility for and manage her mental health needs, manage her medication compliance?
A. Yes.
Q. Follow the recommendation of mental health professionals?
A. Yes.
Q. Meet regularly with her psychiatrist?
A. Yes.
Q. Communicate effectively with her psychiatrist regarding side effects of medications or any concerns regarding potential side effects?
A. Yes.
Q. Maintain medication compliance, be monitored, including working with the therapist ... ?
A. Yes.
Q. Did she do that?
A. She did much of those things, yes.
Q. Well, what do you mean much of those things?
A. She didn't comply with all the therapeutic recommendations. She complied with many of them, yes.
The only requirement that the therapist subsequently testified M.G.S. did not comply with was his recommendation that she attend a "12-step program." The record suggests, however, that the reason she did not attend is because she obtained placement in another program. M.G.S.' guardian, taken by M.G.S. at DFS' urging, insisted that she attend an alternative therapy program for reasons that, as best we can discern, were related to her housing requirements. While not strictly a drug treatment program, the program included issues relating to recognizing the source of drug use so as to better enable early intervention. Although M.G.S. was initially hesitant to follow her guardian's instructions, she complied with her guardian's directive and voluntarily began attending the program after being informed that she would otherwise be placed in respite care. According to the guardian, her behavior in this regard was "not unusual" for someone under guardianship.
Finally, the circuit court found that M.G.S. further failed to fulfill her *710 written service agreements by not supporting C.N.G. while he remained in foster placement. After paying rent and utilities, M.G.S.' conservator allotted her $125 to budget for her and her children's living expenses. That money was properly accounted for and nothing indicated that it was not being properly spent on C.N.G. while he was in M.G.S.' home. Nevertheless, a parent has an obligation to provide support for her child even while in the custody of DFS, In re S.J., 849 S.W.2d 608, 613 (Mo.App.1993), and even if this were not the case, it was required by M.G.S.' service agreement. We find, however, no evidence in the record establishing that M.G.S. did not provide any financial support, even if in a minimal amount. Because the evidence was that the state paid more than $7,000 for C.N.G.'s maintenance, it may well be reasonable to infer that M.G.S. did not provide a large amount of financial support. Of course, one would not expect her to be able to, given that she was receiving only $125 per week to cover all living expenses other than rent and utilities for herself, her teenage son, and C.N.G. during his weekly visits. One cannot, however, reasonably infer from the amount of the state's contribution, that M.G.S. wholly failed to participate in C.N.G.'s financial support to the extent of her ability to do so.
As we have already noted, the evidence supports certain of the circuit court's findings regarding M.G.S' failure to comply with the terms of her written service agreements. At the same time, however, M.G.S. satisfactorily complied with the majority of those requirements and was making sufficient progress that DFS deemed reunification to be coming soon. Because the circuit court improperly considered only whether she had substantially complied with all of the service agreements' terms and did not consider, as § 211.447.4(3)(a) mandated, the significant progress she was making in complying, the circuit court erred in concluding that the evidence clearly, cogently, and convincingly established grounds for terminating M.G.S.' parental relation with C.N.G. The evidence did not clearly, cogently, and convincingly establish that M.G.S. failed to make sufficient progress toward developing the parenting skills necessary to ensure C.N.G.'s safety. Rather, the overwhelming weight of evidence indicates that M.G.S., although by no means perfect in her compliance with the parenting plans, was making significant progress. The juvenile officer's evidence did not instantly tilt the scales in favor of termination. In short, we find neither the persistence of conditions leading to the assumption of jurisdiction, nor conditions of a potentially harmful nature continuing to exist, and, as M.G.S. was nearing the point of reunification prior to the filing of the juvenile officer's petition, the continuation of her relationship with C.N.G. should not greatly diminish his prospects for early integration into a stable and permanent home.
The judgment is against the weight of evidence and is therefore reversed as it pertains to terminating M.G.S.' right to parent C.N.G. Because C.N.G.'s father did not challenge the circuit court's judgment, we leave that portion of the circuit court's judgment undisturbed.
THOMAS H. NEWTON and RONALD R. HOLLIGER, Judges, concur.
NOTES
[1] C.N.G. was the younger of M.G.S.' two sons. Her older son also was under the circuit court's jurisdiction, but his custody is not at issue in this case.
[2] The circuit court also terminated the parental rights of C.W.B., C.N.G.'s father, but C.W.B. did not appeal.
[3] The material deleted repeated M.G.S.' failure to abide by the service agreements but linked it to a particular written service agreement.
[4] Section 211.447.4(3)(a) refers to "a social service plan." The parties and the circuit court treat written service agreements as synonymous with social service plans. Because M.G.S. does not raise this as an issue, we will not address it.