

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| IN RE THE INTEREST OF A.M.W. | ) | ED100740 |
| | ) | |
| | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| | ) | |
| | ) | 13SL-JU00077 |
| | ) | |
| | ) | Honorable John D. Warner, Jr. |
| | ) | |
| | ) | Filed: October 7, 2014 |

### Introduction

This is a sad case of a young girl who became a mother at fifteen years of age, a child herself at the time, to a daughter, A.M.W. This young mother (Mother) inappropriately disciplined her daughter when the child was four, which brought the family to the attention of the Children's Division. Four years later, Mother, now twenty-three years old and more mature, is facing the permanent loss of her daughter through the Circuit Court, Juvenile Division's (juvenile court) involuntary termination of her parental rights. The termination is not due to a current risk of abuse to the child, but to Mother's failure to follow the instructions of the Children's Division.

Mother now appeals the juvenile court's Judgment and Order terminating her parental rights to her daughter, A.M.W. Because the termination was not supported by

sufficient evidence, we reverse the juvenile court's order and remand for entry of a new judgment in accordance with this opinion.

## Background

Mother is the natural parent of A.M.W., born on October 22, 2006. On October 29, 2010, the Department of Social Services, Children's Division (Children's Division) took immediate temporary protective custody of A.M.W. following an incident where Mother struck A.M.W. with a belt on her neck, legs, and arms, causing red marks, welts, and bruises.

At a December 6, 2010 hearing on the temporary placement of A.M.W., the juvenile court found A.M.W. had been abused or neglected, took jurisdiction over her, and placed her in foster care. At this hearing and at later hearings, the juvenile court ordered Mother to participate in a parenting assessment, to participate in counseling, to successfully complete parenting classes, to work toward obtaining her GED, to maintain suitable housing, to obtain and maintain suitable employment, and to participate in a medical or psychiatric assessment concerning her Attention Deficit Hyperactivity Disorder (ADHD) diagnosis. Mother's service plan established that Mother would visit with A.M.W. at least twice per month and provide financial contributions toward her support. Later, the juvenile court also ordered that A.M.W. shall have no contact with any adult without prior approval from Children's Division and that A.M.W. shall have no contact with Mother's boyfriend without the agreement of A.M.W.'s therapist.

In January of 2013, Children's Division filed a petition to terminate Mother's parental rights (TPR). The petition asserted A.M.W. had been in foster care for at least fifteen of the most recent twenty-two months, A.M.W. had been adjudicated abused or

2

neglected in December of 2010, the conditions which led to the juvenile court's assumption of jurisdiction still persisted, potentially harmful conditions existed with little likelihood that the conditions would be remedied, and the continuation of the parent-child relationship greatly diminished A.M.W.'s prospects for integration into a stable and permanent home.

The evidence adduced at the TPR trial revealed the following. Mother was supposed to have visitation with A.M.W. at least twice a month, according to her service plan. In the thirty-three months between November 2010 and July 2013—which was the timeframe testified to at trial—Mother complied with the service plan's twice-a-month visitation for twenty-four months, but did not comply for nine months. The foster care coordinator testified that mother missed twenty-three visits with A.M.W., but our review of the record and testimony reveals that in total, Mother missed seventeen scheduled visits with A.M.W.: twice when she had no transportation, twice for job interviews, five times when she failed to call to confirm the appointment,[1] four times when she canceled the appointment, and four times when she simply failed to appear for a confirmed appointment. Of the four times when she failed to show for a confirmed appointment, she later explained that for two of them she had misunderstood the time. A.M.W. would become very upset when Mother missed visits. Mother also refused to schedule visits between December 15, 2011, and January 31, 2012, because she was angry that she was being denied unsupervised visitation.

Mother's visitation was mostly supervised. Children's Division denied Mother unsupervised visitation because she allowed her boyfriend, J.R., to be present for A.M.W.'s visits, even though Children's Division had not granted him permission to

---

[1] The visitation procedure was that Mother would call the day before the scheduled visit to confirm.

have contact with A.M.W. J.R. is the father of Mother's younger child. Children's Division denied J.R. permission based on its 2010 finding by a preponderance of the evidence that J.R. committed child abuse or neglect. Specifically, J.R. had made an alcoholic beverage for himself in a child's sippy cup and the drink was then given[2] to a child, resulting in the child's hospitalization with a blood alcohol content of .41. J.R. provided certificates of having completed parenting programs. Mother, however, testified at trial that she and J.R. are no longer in a relationship and are just friends.

Mother completed a parenting assessment, which recommended parenting classes. Mother participated in the SMART Parenting program until the program ended for lack of funding in December of 2011. SMART Parenting program documentation showed that Mother completed thirty-five home visits between December of 2010 and November of 2011, five of which were with A.M.W. The SMART Parenting educator reported that Mother was nurturing, loving, and appropriate toward A.M.W. during their visits, and that Mother was cooperative and open to learning and discussing new parenting skills. The SMART Parenting educator stated that she had "no safety concerns" and did not believe A.M.W. would be at risk of being harmed if she were returned to Mother's custody.

Mother began seeing Natasha Turner for counseling services in September of 2011, and was still seeing her at the time of trial. Turner testified at trial that she had given Mother an initial diagnosis of ADHD, which affects her ability to follow through, to organize her life, and her short-term memory. Turner testified that once she had established a system with Mother where her appointments were scheduled on her phone,

---

[2] The record is silent as to who gave the drink to the child. We note that the child at issue in that case was neither A.M.W., nor A.M.W.'s sister.

4

Mother stopped missing appointments. Mother had been prescribed medicine for her ADHD, but she did not take the medicine consistently. Turner testified that Mother was serious about trying to address her issues. Turner had observed Mother with A.M.W. and with her other daughter, and Turner testified that Mother was implementing what she had learned in the SMART Parenting programs, specifically regarding being patient. Turner agreed on cross-examination that she did not know of a medical diagnosis of ADHD, but pointed out that a doctor had prescribed Mother ADHD medication.

Mother was ordered to work on obtaining her GED. Although Mother registered for GED classes more than once, including with the Carondelet Literacy Program, she attended sporadically. Mother took the GED test in July of 2013, but she did not pass all sections.

Mother was ordered to maintain steady employment but failed to do so. She reported several low-wage jobs, but each lasted only a month or so. At the time of trial, Mother had been hired full time at Comcast making $9.00 per hour but had not started yet. Likewise, although she was ordered to contribute financially to the care of A.M.W., she provided only $12.00, a package of diapers, some clothing, a toy, a backpack with school supplies, and some lunches during her visits. Mother was ordered to maintain housing, and she maintained the same housing throughout the pendency of the case. Mother's case worker described the housing as "very appropriate." The case worker expressed concern Mother would be evicted due to unpaid utility bills in April of 2012; however, Mother was able to get the bills paid.

At trial, Kathia Betts, A.M.W.'s therapist, testified to the following. She began treating A.M.W. when she entered the foster system. A.M.W. showed signs of post-

traumatic stress disorder (PTSD) from punishments received from her mother, such as anxiety, fear of loud noises, fear of telephone books and whippings, and enuresis. A.M.W. reported that if she wet herself, Mother would make her stand in the corner with a telephone book[3] or would whip her. Betts testified the PTSD therapy had been successful. A.M.W. was no longer afraid of loud noises and had stated she was no longer afraid Mother would whip her. Moreover, A.M.W. had begun to learn to control her temper tantrums. At first A.M.W. had had tantrums about being away from her Mother. Her tantrums had improved to the point where Betts was going to discharge A.M.W., until A.M.W. began having PTSD symptoms again in February of 2013, which was around the time she was informed that she might not be reunified with Mother and her sibling. The tantrums she had starting in February would last as long as thirty minutes[4] and required hospitalization on two occasions. Betts stated that permanency would be best for A.M.W., but she was unable to say whether A.M.W. would be better off with her Mother or her foster family. Betts testified that A.M.W. wanted to live with her Mother.

Mother's Children's Division caseworker, Trenice Green, testified that she had concerns about Mother's ability, based on her history of missing appointments, to ensure that A.M.W. would take her various medicines and get to medical appointments, or to meet A.M.W.'s behavioral needs. Green testified that Mother was very interested in A.M.W. and that she and A.M.W. would have a lot of fun together during visits; nevertheless, Mother had shown a lack of commitment toward her through inconsistent visits and "follow through." Green testified that TPR was in A.M.W.'s best interest to

---

[3] Mother stated that on the advice of a neighbor, she would make A.M.W. stand in the corner for four minutes—one minute per her age in years—holding a book.

[4] However, A.M.W.'s foster mother testified that A.M.W.'s tantrums since February 2013 would last an hour and as long as four hours. A.M.W. was hospitalized because she threatened to harm herself or others.

secure stability and permanency. Green completed an Investigative Report and Social Study (Report) dated February 22, 2013, which was entered into the record. The Report stated that Mother has no problems with chemical dependency.

Mother testified at trial to the following. Regarding her parenting skills, she had learned coping mechanisms to deal with frustration and to increase her patience, putting her children first, and how to redirect a child to appropriate behaviors. She had planned how to deal with A.M.W.'s tantrums. Moreover, over the last three years she had realized the importance of learning about childhood development. Mother explained that she was much more mature now than she was when A.M.W. was taken into foster care. Mother was fifteen years old when she had A.M.W., and nineteen when A.M.W. went into care. She was twenty-three at the time of trial. She expressed remorse that she had physically disciplined and harmed A.M.W. Regarding Mother's ADHD, she began taking medicine for ADHD after her younger child's birth in October of 2012.

A.M.W.'s *guardian ad litem* testified that his recommendation was for TPR. After the incident of severe abuse, Mother has missed appointments and visitation with A.M.W. over the last three years. It was his opinion that Mother had only in the last couple weeks before trial attempted to establish a surface compliance with the court's orders, but he did not believe her attempts amounted to substantial compliance. In light of Mother's need for assistance, plus A.M.W.'s needs, he did not believe reunification was possible in the foreseeable future.

After the hearing, the juvenile court granted the Children Division's petition for TPR under Sections 211.447.5(2) (abuse or neglect) and 211.447.5(3) (failure to rectify).[5] The TPR judgment noted the previous incident of abuse and found that Mother failed to

---

[5] All statutory references are to RSMo. (Cum. Supp. 2013), unless otherwise indicated.

comply with her service plan and court-ordered services, in that she failed to consistently visit with the child, failed to provide verification of a medical evaluation for ADHD, failed to consistently work on and obtain her GED, failed to provide financially for A.M.W., and failed to adjust her circumstances or provide a proper home for A.M.W. The court found that termination would be in the best interest of A.M.W. This appeal follows.

## Discussion

In her two points on appeal, Mother argues the juvenile court erred in granting the TPR, because the decision was not supported by sufficient evidence (Point I) and because the decision failed to comply with statutory findings-of-fact requirement (Point II). We reverse on Point I, and thus we do not reach Point II.

## Point I

In her first point on appeal, Mother argues the juvenile court erred in granting the TPR, because there was insufficient evidence to support its decision, in that the grounds supporting the TPR did not comply with Section 211.447. We agree that the TPR judgment was not supported by substantial evidence.

We will affirm a judgment terminating parental rights unless there is not substantial evidence to support it, the judgment is contrary to the evidence, or the court erred in its application of the law. In re L.J.D., 352 S.W.3d 658, 662 (Mo. App. E.D. 2011). Substantial evidence is clear, cogent, and convincing evidence. In re K.A.W., 133 S.W.3d 1, 12 (Mo. banc 2004). Nevertheless, "[a] parent's right to raise his or her children is a fundamental liberty right protected by the constitutional guarantees of due process." In re C.F., 340 S.W.3d 296, 298 (Mo. App. E.D. 2011). Because a court's

8

termination of the parent-child relationship has been characterized as "tantamount to a 'civil death penalty,'" we review it closely. K.A.W., 133 S.W.3d at 12 (citation omitted). TPR statutes should be strictly construed in favor of the parent and preservation of the natural parent-child relationship. Id. TPR is appropriate when the State has proved at least one statutory ground for termination and the juvenile court has determined that termination is in the best interest of the child. Section 211.447.6; In re S.J.H., 124 S.W.3d 63, 66 (Mo. App. W.D. 2004).

The juvenile court here granted TPR under Sections 211.447.5(2) (abuse or neglect) and 211.447.5(3) (failure to rectify). We address each in turn.

(A) Section 211.447.5(2)

Section 211.447.5(2) states that the abuse or neglect of a child is grounds for TPR. In determining whether termination is warranted under this section, the juvenile court is required to consider and make findings on the following conditions or acts of the parent: (a) a mental condition preventing the parent from providing the child with the necessary care; (b) a chemical dependency preventing the parent from providing the child with the necessary care; (c) a severe act or recurrent acts of physical, emotional, or sexual abuse toward the child by the parent or by another under circumstances from which the parent should have known of the abuse; or (d) repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. Section 211.447.5(2)(a)-(d). Proof of any one of these factors is sufficient to terminate parental rights. In re C.F.C., 156 S.W.3d 422, 427 (Mo. App. E.D. 2005). The juvenile court's

9

findings must be sufficiently specific to establish the court properly considered the factor in granting the TPR. Conclusory findings may be grounds for reversal. Id.

The juvenile court here granted TPR under Section 211.447.5(2) based on both abuse and neglect, after finding Mother committed a severe act of abuse in 2010 and neglected A.M.W. during the pendency of the court's jurisdiction.

(1) Abuse

Missouri law is clear that the termination of parental rights must be based on parental deficiencies at the time of the termination. See K.A.W., 133 S.W.3d at 9-10. While evidence of past behavior and of a parent's behavior during the juvenile court's jurisdiction is relevant, the parent-child relationship should only be severed upon proof that the parent is currently unable to adequately care for the child and will be unlikely to do so in the future. See id.

Here, the juvenile court's jurisdiction stemmed from one 2010 incident of abuse where Mother whipped A.M.W. with a belt. However, the juvenile court made no finding—and the record does not show—that the recorded circumstance of abuse still existed at the time of termination. Rather, the evidence shows that Mother participated in the SMART Parenting program from December of 2010 through November of 2011, attending thirty-five sessions. Her SMART Parenting educator reported that Mother was appropriate toward A.M.W. as far as she had observed, and Mother was learning parenting skills. The SMART Parenting educator stated she had "no safety concerns" and did not believe A.M.W. was at risk of being harmed.

Likewise, Mother's counselor had observed Mother with A.M.W., and she testified Mother was implementing what she had learned in the parenting classes,

10

specifically regarding being patient. Mother testified that she had learned appropriate disciplinary methods from the parenting classes and from watching A.M.W.'s foster mother, and she realized her prior disciplinary methods were wrong.

The juvenile court's findings are insufficient to support termination under Section 211.447.5(2). There was no evidence in the record that Mother still presented a danger of physical abuse to A.M.W. Rather, A.M.W.'s therapist testified that A.M.W. had recovered from her PTSD related to Mother's punishment. While A.M.W. had recently had a resurgence in her PTSD symptoms, according to her therapist, the resurgence was attributable to being told that she might not be reunified with Mother.

(2) Neglect

As well, the juvenile court found that Mother neglected A.M.W. by "repeatedly and continuously" failing to provide A.M.W. with "adequate food, clothing, shelter or other care." Neglect is defined as the "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being...." Section 210.110(12), RSMo. (Cum. Supp. 2005). To determine whether neglect has occurred, the court should make specific factual findings regarding any "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development." In re J.A.R., 426 S.W.3d 624, 630 (Mo. banc 2014).

Here, the juvenile court found that Mother "repeatedly and continuously failed, although physically or financially able, to provide" for A.M.W. In support of this

conclusion, the court made only three findings. The court found Mother provided no financial support for A.M.W. during the pendency of the matter, Mother did not maintain employment, and although Mother maintained appropriate housing, Children's Division was concerned about Mother's ability to provide housing. These findings are inadequate to support the TPR.

Initially, we note that the juvenile court did not determine, nor did Children's Division ever allege, that Mother neglected A.M.W. prior to the court's assumption of jurisdiction in 2010. Prior to 2010, A.M.W. had lived with Mother for four years. Moreover, the court's findings fail to articulate whether Mother's alleged acts of neglect provide an indication of the likelihood of future neglect. See C.F.C., 156 S.W.3d at 428 (TPR cannot be based on past conduct alone; rather, court must *explicitly* consider whether past acts provide indication of likelihood of future harm) (emphasis added). Instead, the evidence showed that Mother had maintained appropriate housing for the last three years, even during the time in April of 2012 when she was late paying her utility bills. While Mother was frequently unemployed, her unemployment had not affected her ability to house or feed herself and A.M.W.'s younger sister, who was not under the jurisdiction of the juvenile court. Further, the evidence at trial was that Mother was currently employed in a full-time position.

As for Mother's failure to provide financial support for A.M.W. while she was in foster care, such failure is not itself proof that Mother will not provide for A.M.W. in the future. See id. at 428-29. The court noted Mother's unemployment but then found she was "physically or financially able" to provide for A.W.M.'s support yet failed to. The record is devoid of any information about what other sources of income, such as social

12

security or food stamps, Mother might receive that would support the court's finding that she was able to pay child support. Rather, we question whether with several temporary low-wage jobs she was in fact able to. The court's findings are insufficient in this regard.

Viewing the record as a whole, the juvenile court's judgment terminating Mother's parental rights based on the risk for abuse and neglect at the time of termination is not supported by substantial evidence. See L.J.D., 352 S.W.3d at 662.

(B) Section 211.447.5(3)

As well, the juvenile court ordered the termination of Mother's parental rights under Section 211.447.5(3), failure to rectify, after finding that A.M.W. had been under the jurisdiction of the court for over one year and the conditions that led to the assumption of jurisdiction still persisted, or conditions of a potentially harmful nature continued to exist, or the continuation of the parent-child relationship greatly diminished A.M.W.'s prospects for early integration into a stable and permanent home. The juvenile court did not specify upon which condition it relied. Supporting termination, the court found that Mother failed to comply with the requirements of her service plan in multiple respects and had "failed to adjust her circumstances or conduct to provide a proper home for the child."

A parent's failure to comply with a service plan does not alone constitute grounds for termination. In re J.R., 347 S.W.3d 641, 646 (Mo. App. E.D. 2011); S.J.H., 124 S.W.3d at 67. Non-compliance is merely a factor to consider in determining whether the grounds set forth in Section 211.447.5(3) exist. In re C.N.G., 109 S.W.3d 702, 707 (Mo. App. W.D. 2003). Moreover, while Section 211.447.5(3) requires the juvenile court to consider "the extent to which the parties have made progress in complying" with the

13

terms of the service plan, the legislature does not mandate total, or even substantial, compliance. Section 211.447.5(3)(a); C.N.G., 109 S.W.3d at 707. Rather, the issue is whether the parent has made progress toward complying with the service plan. C.N.G., 109 S.W.3d at 707. Again, we "strictly construe[] [the TPR statutes] in favor of the parent and preservation of natural parent-child relationship." K.A.W., 133 S.W.3d at 12.

Here, the juvenile court found that Mother had knowingly entered into a service plan with Children's Division that required her to complete a parenting assessment, participate in individual counseling, complete parenting classes, work on obtaining her GED, maintain suitable housing, obtain and maintain employment, visit A.M.W. twice a month, make financial contributions toward A.M.W.'s care, and participate in a medical or psychiatric assessment to verify her ADHD diagnosis. After the trial, the juvenile court found Mother had complied with the service plan only minimally. While we agree that Mother did not fully comply with her service plan, the proper issue is whether she made progress toward complying with the service plan or whether her lack of compliance evidenced that the conditions that led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions will be remedied, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. See Section 211.447.5(3); C.N.G., 109 S.W.3d at 707. The evidence at trial regarding Mother's compliance with the service plan is as follows.

(1) Parenting Assessment and Classes: Mother completed the parenting assessment, which recommended parenting classes. Mother then participated in the SMART Parenting program, meeting with the SMART Parenting educator thirty-five times

14

between December of 2010 and November of 2011. Mother's SMART Parenting educator reported that Mother was cooperative and open to learning parenting skills.

(2) Counseling: Mother began seeing Turner in September of 2011 and was still seeing her at the time of trial. Mother attended sessions with increasing regularity once she developed an effective reminder system.

(3) GED: Mother enrolled in three different GED classes, but attended irregularly. She took the GED test in July of 2013 and passed some but not all sections.

(4) Maintain Suitable Housing: Mother maintained the same appropriate housing throughout the pendency of the case. A.M.W.'s younger sister resides with Mother in this home. In three years, Mother once fell behind on her utilities, but she was able to secure payment for the bills and restore service.

(5) Employment: Mother obtained several low-wage jobs throughout the pendency of the case, but did not maintain them. At the time of trial, she had recently been hired in a full-time position at Comcast making $9.00 per hour.

(6) Visitation: Mother visited A.M.W. twice a month for twenty-four of the thirty-three month period prior to trial, but missed a total of seventeen visits. The judgment listed the dates of twenty-two missed visits, but we could not find support in the record for at least eight of the listed dates.

(7) Financial Contribution: Mother provided only $12.00, a package of diapers, a toy, some clothing, a backpack with school supplies, and some lunches for A.M.W. during visits.

(8) Psychiatric Assessment: Mother was ordered to participate in a medical or psychiatric assessment concerning her ADHD diagnosis. It appears from the record that

Mother failed to do so. However, the record includes a document from Victoria Spencer, M.D., with the Family Care Health Centers, confirming Mother's ADHD diagnosis and that Spencer had prescribed Mother Ritalin.

Close review of the record as a whole demonstrates undeniable progress in most of the areas ordered by the juvenile court. Mother successfully participated in parenting classes and counseling, and she maintained a stable residence. Turner testified that Mother was doing better with managing her ADHD. While less successful, Mother had "worked on obtaining" her GED: she attended some GED classes and took the GED test, albeit unsuccessfully. Mother obtained a series of jobs, but was unable to keep them. While she failed to maintain employment, she continued to pursue employment, and immediately prior to trial she had obtained a new full-time job. Not only does the record in fact demonstrate progress, but also, the TPR judgment does not address how Mother's failure to obtain her GED or hold down a steady job were a potential harm to A.M.W. at the time of the TPR or in the future. Termination may not be based upon failure to comply with the service plan in itself, but only to the extent the non-compliance demonstrates harm to the child. See In re K.W., 167 S.W.3d 206, 215-16 (Mo. App. E.D. 2005); C.F.C., 156 S.W.3d at 431 (reversing and remanding in part for trial court's failure to discuss how lack of compliance with service plan impacted future ability to parent); C.N.G., 109 S.W.3d at 707. Certainly, many thousands of Missouri parents have successfully raised children despite being poor and uneducated.

Turning to Mother's financial contributions, we agree that Mother did not contribute financially in a meaningful way to A.M.W.'s care. She provided no child

16

support,[6] and for in-kind support, she provided only diapers, clothes, a toy, a backpack with school supplies, and lunches. Nevertheless, a parent's contributions are relevant not for the purpose of defraying costs to the State but to demonstrate the parent's intent to continue the parent-child relationship. See e.g., In re S.M.H., 160 S.W.3d 355, 366-67 (Mo. banc 2005). Even minimal contributions, such as the ones Mother made here, can demonstrate a parent's intent to continue the parent-child relationship. See id. at 367. Accordingly, the record failed to show that, based on Mother's small contributions to A.M.W.'s care, conditions of a potentially harmful nature continue to exist without likelihood of remedy. See Section 211.447.5(3).

Likewise, Mother did not participate in the court-ordered medical or psychiatric assessment. However, the purpose of the ordered assessment was to confirm Mother's diagnosis of ADHD, and Mother provided the court with other evidence of her ADHD diagnosis in the form of a letter from her doctor. It appears to this Court that when dealing with such an important issue as the permanent separation of a family, compliance with the spirit, if not the absolute letter, of the order should suffice in this particular regard.

Last, Mother's most troubling non-compliance was regarding visitation. Mother had visited A.M.W. in accordance with the terms of her service plan for twenty-four of

---

[6] It is not clear that Mother knew she had to provide for A.M.W.'s care. While parents must provide support for their children even when the children are in the custody of the State, if Children's Division has made no demand for financial support from the parent, a reasonable person could believe that financial assistance is unnecessary, especially in times of unemployment. In re P.C., 62 S.W.3d 600, 605 (Mo. App. W.D. 2001). While Mother was ordered to generally provide support for A.M.W., she received no specific demand for support from Children's Division. Rather, the foster mother told Mother that she did not need to provide money, and Mother's Children's Division caseworker sent Mother a carbon copy of a letter to a third party stating Mother had no financial obligation toward A.M.W. We note that the foster mother has expressed a desire to adopt A.M.W., which is viewed favorably by Children's Division. The juvenile court terminated Mother's parental rights, based in part on her failure to contribute financially for A.M.W.'s care, after the foster mother told Mother not to provide money. The juvenile court then ordered A.M.W. to remain in foster care with the plan of adoption.

the thirty-three months prior to trial, but she had missed seventeen scheduled visits. In addition, Mother intentionally refused to schedule visits with A.M.W. for December of 2011 and January of 2012, because she was angry about not receiving unsupervised visitation. We do not condone Mother's attitude (especially as her anger with Children's Division caused A.M.W. to spend Christmas without her mother); however, we are sympathetic to her frustration with the Children's Division. Children's Division had denied Mother unsupervised visitation because she allowed J.R., the father of her younger child, to participate in her visits with A.M.W. Considering the family circumstances, we disagree with Children's Division's refusal to work with Mother and J.R. as a family unit despite the previous finding by a preponderance of the evidence that J.R. committed child abuse or neglect. There was no evidence in the record that J.R. was a danger to A.M.W. We note that J.R. provided proof he had participated in parenting classes after his earlier history of child abuse.

Nevertheless, the record shows that Mother missed visits twice because she could not find transportation, twice because she made errors about the visit times, and twice due to job interviews. More importantly, the record also shows that Mother's visits were frequently rescheduled resulting in compliance with her service plan visitation requirements. Close review of the record reveals the following: Mother missed a scheduled visit on May 27, 2011, but still visited with A.M.W. twice that month, in compliance with her service plan. Likewise, she missed a visit on October 15, 2011, but visited with A.M.W. three times that month; she missed February 16 and 27, 2012, but completed two other visits that month; she missed March 12 and 27, 2012, but still visited with A.M.W. twice that month; she missed scheduled visits on April 3, 2012, May

18

29, 2012, and June 26, 2012, but she visited A.M.W. three times each of those months, in excess of her service-plan requirements; she missed October 4, 2012, but completed two visits that month; and she missed April 2 and 16, 2013, but still completed two visits that month. Accordingly, in light of the entire record, Mother's missed visits do not appear to this Court to constitute the level of inconsistency and lack of interest portrayed by Children's Division. Moreover, the juvenile court did not discuss how Mother's failure to comply with this element of the service plan impacted her future ability to parent A.M.W. See K.W., 167 S.W.3d at 215; C.F.C., 156 S.W.3d at 431; C.N.G., 109 S.W.3d at 707.

It appears to this Court that many of Mother's failures in complying with her service plan stemmed from three things. (1) Her poverty: she paid no child support, she missed several visits with A.M.W. due to not having transportation, and she could not maintain employment. (2) Her youth: Mother was fifteen years old, a child herself, when she had A.M.W. and was admittedly ignorant of childhood development and proper parenting techniques. At the time of trial, she was twenty-three years old, had completed an intensive parenting program, and articulated at trial that she has a plan to deal with A.M.W.'s tantrums. (3) Her ADHD: Mother's counselor testified that Mother's ADHD affects her ability to remember appointments, and once Mother implemented an effective reminder system, she stopped missing appointments as frequently. Mother testified that after her other child's birth she began taking medication for her ADHD. Moreover, the evidence repeatedly demonstrated that A.M.W. very much wants to return to Mother. There was no evidence that Mother had problems with alcohol or drug use, or had engaged in criminal activity.

19

In total, we find the juvenile court's judgment terminating Mother's parental rights for her failure to rectify the condition leading to the assumption of jurisdiction or another dangerous condition was not supported by substantial evidence. See L.J.D., 352 S.W.3d at 662. Point granted. In light of our reversal on Point One, we need not address Point Two.

Regarding custody, the overwhelming weight of the evidence at trial was that stability and permanency was in the best interest of A.M.W. We do not believe that continuing A.M.W. in foster care will contribute to permanency. The record as a whole does not demonstrate that A.M.W. is in danger of abuse or neglect in Mother's custody, or that Mother is unable to provide A.M.W. with a stable or proper home. Thus, it is in the best interest of A.M.W. to be returned to the custody of Mother and to continue to receive in-home services. A.M.W. has emotional ties to Mother; Mother maintained regular visitation with A.M.W. for twenty-four of the thirty-three months prior to trial; Mother has not been convicted of a felony offense; and, other than the 2010 incident from which the juvenile court's jurisdiction stemmed, Mother has not committed acts subjecting A.M.W. to a substantial risk of physical or mental harm. While Mother has not contributed to the costs of care and maintenance for A.M.W., in total, Mother has not shown a disinterest or lack of commitment to the child. See Section 211.447.7(1)-(7) (best interest analysis). The juvenile court shall retain jurisdiction over A.M.W., and we reverse for the entry of an order in accordance with this opinion.

## Conclusion

The judgment is reversed and remanded for further proceedings in accordance with this opinion.

_____
Gary M. Gaertner, Jr., Judge

Kurt S. Odenwald, P.J., concurs in result.
Robert G. Dowd, Jr., J., concurs.

21



# In the Missouri Court of Appeals
# Eastern District

## DIVISION III



In the Interest of A.M.W.

)
)
)
)
)
)
)
)
)
)

ED100740

Appeal from the Circuit Court
of St. Louis County

Honorable John D. Warner, Jr.

Filed: October 7, 2014

I concur in result only. I agree with the majority that the facts before us may not support the termination of Mother's parental rights at this time. I also agree that A.M.W. should remain under the jurisdiction of the juvenile court. Unfortunately, this result leaves a young child in a continued state of uncertainty as to her future. I differ from the author of the majority opinion in that I am not persuaded Mother's failure to meet the requirements of the service plan over the past several years stems solely from her financial disadvantage or lack of education. While I sympathize with the plight of Mother becoming a parent at the age of 15, we are charged to make decisions based upon what is in the best interest of the child—not the best interest of Mother. When those interests conflict, the interest of the child prevails.

A.M.W. has been under the protective custody of the juvenile court since December, 2010. Almost four years have passed. A.M.W. is now 8 years old and has lived a considerable

portion of her life in foster care. There comes a time when, in the best interest of the child, this state of uncertainty must come to an end so that the child may have the opportunity to be a part of a permanent family—either with Mother or prospective adoptive parents. Under the current situation, A.M.W. has neither. Mother has had almost four years to get her act together and demonstrate to the juvenile court that it is A.M.W.'s best interest to be returned to her. As the majority opinion concludes, that she has not done. Hopefully, our reluctance to terminate Mother's parental rights at this time will provide Mother with the encouragement to complete the requirements of the service plan in such a manner so as to convince the juvenile court to allow A.M.W. to be returned to her custody. Unfortunately, our unwillingness to terminate Mother's parental rights at this time may impede the chance for A.M.W. to become part of an adoptive family should Mother continue on the path she has followed since A.M.W. was placed in the protective custody of the juvenile court. That would be a tragedy. Mother has a limited window of opportunity to correct this situation and act in the best interests of A.M.W.

Kurt S. Odenwald, Presiding Judge